BUSH
*vs.*
MADEIRA'S
HEIRS.

---

Case 44.

## Bush *vs.* Madeira's heirs.

### APPEAL FROM THE KENTON CIRCUIT.

1. The pre-existing principles and practice of courts of equity, on the subject of bills of review, has not been changed by the Code of Practice.

2. The facts stated in the pleading which is demurred to are to be taken as true except so far as they differ from exhibits referred to, unless the exhibits be impeached.

3. The case for decision.

4. A bill of review lies in behalf of a party upon the discovery of written evidence tending to establish a material fact in issue in a suit, even after it has been decided by the court of appeals, if from the facts alledged it was not to be expected that the party could have found such evidence unless by extreme vigilence.

Judge Marshall delivered the opinion of the court.

Bush,
vs.
Madeira's
Heirs.

October 10.

We suppose it is not very material whether the pleading, in which Bush prays for a review and reversal of the decrees therein mentioned, is called a petition or a bill. If it contain sufficient matter to authorize a review of the decrees complained of, the question whether the mode of proceeding is to be regulated by the Code or by the pre-existing practice, is one that will arise subsequently. The material question on the demurrer is whether the matter alleged is sufficient to authorize a review; and this question is argued, on all sides, with reference to the pre-existing principles and practice of courts of equity on this subject, which have not, as we suppose, been changed by the Code.

1. The pre-existing principles and practice of courts of equity, on the subject of bills of review, has not been, changed by the Code of Practice.

The demurrer admits, for the purpose of testing their sufficiency, the facts stated in the petition or bill; but the exhibits referred to must be taken into view, as controlling any statement which is inconsistent with them, except so far as the exhibits are themselves directly impeached.

2. The facts stated in the pleading which is demurred to are to be taken as true except so far as they differ from exhibits referred, unless the exhibits be impeached.

The nature of the decrees now brought in question, and of the proceedings on which they were founded, is fully detailed in the opinion of this court, rendered in the case of *Madeira's heirs v. Hopkins, &c.* 12 *B. Monroe*, 595. It is sufficient now to state, that in 1831, Hopkins filed his bill against the administrator and the infant heirs of Madeira, claiming to have purchased from Madeira, in his lifetime, four lots 234, 235, 236, and 237, in the town of Covington, situated on the north side of fifth street, between Greenup and Sanford streets, and also the block or parcel of ground on the opposite side of fifth street, extending to the southern boundary of the town, and professing to exhibit a bond for title to the said lots and ground, setting forth the terms of purchase, and alleging payment of the price, except a sum paid into court, obtained a decree for conveyance, and a commissioners deed for the land. In 1848, after having sold the whole or nearly the whole of this land, to va-

3. The case for decision.

rious purchasers, who had made valuable improvements thereon, Hopkins filed a second bill against Madeira's heirs, alleging the purchase as before the loss of the bond, the payments made, and praying for a confirmation of his title, which might not be valid under the first decree. To this bill the heirs of Madeira answered, denying that their father, Jacob Madeira, had ever made any written contract for the sale of any part of said land, admitting that they had learned from his memoranda or books, in which he kept regular statements of all sales, &c., that he had made some verbal agreement about the sale of said lots 234, 235, 236, and 237, at the price of two hundred dollars. But they deny that there was any written agreement in reference to them; and aver that there was no contract, verbal or written, for the sale of the ground on the south side of fifth street. They made their answer a cross-bill, alleging errors and irregularities in the former suit; and to obtain possession made the purchasers from Hopkins' defendants, and among them Bush, who, in his answer, claimed to be an innocent purchaser, set forth his claim under a bond from Hopkins to J. M. Gaines, including the four lots above mentioned, and some of the ground on the opposite side of fifth street, and an agreed partition between Gaines and himself, by which the lots 235, 236, and 237 were allotted to him; and he claims these lots, and one other on the south side of fifth street, on the ground of the purchase of Hopkins, and relies on his allegations, and on the bond, and on long and peaceable possession.

On the hearing, the circuit court decreed a conveyance from Madeira's heirs to Hopkins for the whole of the land claimed by him, and dismissed their cross-bill. But this court, in the opinion above cited, reversed that decree, and also the decree in the suit of 1831, and being of opinion that the terms of the alleged bond were not sufficiently proved, sent back the case, with directions to dismiss the bill of Hop-

kins, and to take an account of rents and improvements, &c., preparatory to a final disposition of the case upon the cross-bills. That opinion was rendered on the —— January, 1852.

On the 21st day of July, 1852, Bush, with the leave of the court, filed this petition for a review. The petition states, briefly, the proceedings above mentioned, and states, that at the close of the preceding term of the circuit court in which it was filed, the opinion and mandate of the court of appeals being certified to that court, an order was made in conformity therewith, directing commissioners to ascertain and settle on account of rents, &c. And the plaintiff states, that since the rendition of the reversed decree, and since the reversal of that decree by this court, he has learned, that on the 30th November, 1828, Jacob Madeira entered into an agreement with said Hopkins for the sale of the four lots 234, 235, 236, and 237, for the sum of two hundred dollars, of which fifty dollars were paid in cash, and the residue was to be paid in six, twelve, and eighteen months, which agreement was reduced to writing and signed by said Madeira, who, at the sametime, made a provisional agreement with Hopkins for the sale of the ground south of fifth street, believed also to have been in writing, but of which sufficient evidence has not been found. He states, also, that since the rendition of said decrees he has ascertained that said Madeira, about the 15th day of April, 1829, wrote a letter to Warder and Brothers, of Philadelphia, to whom he was accountable for sales of certain lots and lands in Covington, including those now in question, in which letter he set forth the sale which had been made to Hopkins, (stating by mistake the name as J. Hopkins instead of Wm. Hopkins,) of the four lots above described, specified the terms of sale as above stated, and acknowledged the receipt of $50, which he accounted for to said Warder & Brothers ; and he refers to the affidavit of J. G. Arnold to show that William Hopkins was intended instead of J. Hopkins. He states, further,

that since the rendition of said decrees he has learned, for the first time, that a copy of this letter, statement, and account, comprised in the letter book of said Madeira, was and is in possession of E. S. Haines, of Cincinnati, the administrator of said Madeira. In proof of which he files the affidavit of A. M. Spencer, who was the clerk of Maderia at the time of the sale, and copied said letter, statement, and account in the letter book, the original having been transmitted to Warder & Brother, and if now in existance, not in Kentucky, &c. He states that he had no previous information of the foregoing facts, or of the letter or the copy, and no means of acquiring such information but that all the facts in relation to the existence and contents of said letter, statement, and account were, at the time of filing their answer and cross-bill, and at the date of said decrees, within the knowledge of said Aston and Addison D. Maderia, the heirs of Jacob Madeira, and that they unfairly and fraudulently concealed said facts from the plaintiff and from the court, and so obtained said decress, as far as these four lots are concerned, by fraud and concealment. He states that he is further informed and believes, that said letter-book contains the copy of another letter, showing the receipt by Madeira of $50, the first deferred instalment of the purchase money, and that these sums, together with the sum paid by Hopkins under the first decree, and other payments proved, are more than sufficient to discharge the whole sum due for said four lots, even if payment of the balance should not be presumed; he refers to and files the affidavit of T. D. Carneal, who, in the original suit, proved the execution of a bond by Madeira for the lots, and the other ground claimed by Hopkins, but could not state the terms of sale, having seen the copy of the letter first above referred to, and who having his memory thereby refreshed, now recollects and states the execution of a bond by Madeira for the conveyance of the four lots above mentioned, and the price and terms of payment, as above stated.

And the plaintiff, alleging the death of Hopkins and also of Gaines, and making the heirs of each, and also the heirs of Madeira defendants, prays for a review and reversal of so much of said decrees as effects the said lots 235, 236, and 237, and that he may be quieted in his possession, and may have a conveyance, &c., from Madeira's heirs, and for other proper relief. The three affidavits sustain the statements of the petition as to the facts to which they relate, and that of Spencer contains a tabular statement, exemplifying, as he says, that which was contained in the original letter, and copied by him in the letter-book, showing a sale on 30th of November, 1828, of lots Nos. 234, 235, 236, and 237, to J. Hopkins, for $200, viz: $50 paid in cash, and the rest in six, twelve, and eighteen months. Arnold states that there was no J. Hopkins about Covington about the period of the sale. But independently of this, the answer of the Madeiras' in the original suit of 1848, and the entire proof in that case showing the history of the lots from 1828 to the time of the decree, make it absolutely certain that the sale stated in said letter was to William Hopkins, and that the initial J. was inserted by mistake. It was also proved in the former case that there was a bond from Madeira to Wm. Hopkins, for the conveyance not only of the four lots 234, 235, 236, and 237, but also of the ground on the other side. Bush alleges in substance, that he has since the decree discovered that there was a distinct sale of these four lots on the terms stated, and a bond for conveyance of them on payment of the price, and that he has also discovered evidence of the sale and terms and partial payments, as now alleged, consisting of entries in Madeira's letter-book, proved to be copies of Madeira's own letters, giving a regular account of said sale and receipts.

This letter-book must be regarded as furnishing evidence entirely satisfactory of the fact and terms of the sale; and if the original letter, which it proves, be not itself such a written memorandum of the contract

as might be enforced, which we are not prepared to deny, the fact that such a letter was written by the party having the legal title to persons entitled to an account of sales and proceeds, makes it so entirely probable that there was a bond conforming to this sale, and making a part of it, as scarcely to require additional evidence of the fact; and when we look to the deposition of Carneal, in the former case, proving that their was a bond which he then says covered not only the four lots above mentioned, but also the ground on the opposite side of fifth street, the necessary inference is, not that there was no bond covering the four lots, but that Carneal was mistaken as to the extent of the bond, or that it was in fact as extensive as he stated it to be. His present affidavit, therefore, comes in not to prove that there was a bond for conveyence of the four lots, or the terms in which they were sold, but to prove what he says the copy of Madeira's letter has brought to his recollection, that the sale of the four lots, upon the terms mentioned in the letter, was absolute, and a bond given therefor accordingly, which did not include the ground on the south side of fifth street; as to which, he says, there was at the same time a verbal agreement to be reduced to writing afterwards when Hopkins should produce a certain cash note which was to be taken in payment. And, as it is proved in the original case, that this note was delivered, it is easy to suppose that Carneal, though himself concerned in making the contract for Hopkins, might, after the lapse of twenty years or more, have confounded the two sales, and that his memory might be refreshed by the letter of Madeira furnishing strong evidence of a distinct sale of the four lots; and we are not prepared to say that, under such circumstances, the party interested, and especially an innocent party, shall be precluded from the benefit of the refreshed recollection of the witness.

But if this affidavit were out of the case, or if, with its statement, it be still doubtful whether the bond included only the four lots or extended also to the other

ground in question, it must still be deemed certain that there was a bond for the four lots. This fact certainly established, together with the evidence now furnished of the terms on which these lots were sold, and of a compliance with those terms, authorizing the inference that there was a distinct contract for these lots, though the bond might have included other land, would, if all this had appeared in the original case, have constituted an insuperable obstacle to granting, so far as these four lots were concerned, the relief prayed for by Madeira's heirs in their cross-bill; and as it would have been manifest that Hopkins or his vendees were entitled to a conveyance of these lots from Madeira's heirs, this court, if it could not have directed such conveyance as the pleadings then stood, must have remanded the cause with directions either to dismiss the bill without prejudice, or to allow the vendees of Hopkins, claiming these lots, to amend their pleadings so as to obtain the proper relief. The doubt whether the bond did or did not embrace other ground, in addition to the four lots proved by the letter-book to have been sold upon distinct terms, in which no other land or lots were included, would have presented no obstacle to a decree for a conveyance of those lots, and should not prevent the review and reversal of the decree refusing all relief: and as the evidence now brought forward from the letter-book of Madeira is of a character sufficiently stable and certain to authorize a review, the question upon this part of the case is, whether it has in fact been discovered too late to be used in the original case, and if it be such as the party could not, by reasonable diligence, have discovered in time for such use. The petitioner alleges that he discovered the facts and the evidence since the rendition of the decree, and had no means of discovering it before, and upon the demurrer this is to be taken as true except so far as it is contradicted by facts or exhibits proper to be considered on the demurrer. And it is contended that there is enough in the original record to show that the plain-

tiff might have known of the evidence furnished by the letter-book, and might have obtained it for use in the original case. The answer of Madeira's heirs, and the deposition of Haines, the administrator of Madeira, are referred to in support of this proposition.

The substance of the answer on this subject has already been stated, and we remark, that although'it shows that the letter-book or other books of Madeira contained some statement in reference to the sale of the lots, and that the respondents were fully aware of the nature of the statement, it did not show anything which would establish or tend to establish the existence of a written contract for their sale. It was, therefore, rather calculated to withdraw the attention of the claimants from the books than to attract it to them, and might be regarded as a specimen of apparent candor well calculated to lull, if not intended to deceive, the oppositie party.

The deposition of Haines, who had the custody of the books, is still more vague with respect to any reference therein, to the sale from Madeira to Hopkins; and so far from showing that Bush or Hopkins might have discovered and availed themselves of whatever evidence the books contained, the deposition shows that Haines, while he denied knowledge of any thing in them material to the present case, distinctly refused to allow an inspection of them, and also refused to give extracts from them, saying that he did not feel at liberty to do so, but would surrender them to Madeira's heirs; and it appeared then, as now, that the books were not within the State of Kentucky, but in Cincinnati, Ohio.

If it be conceded that a party or counsel of extreme vigilance might, in a proper state of case, have instituted some means of coercing a production of these books under penalty of refusing any aid to Madeira's heirs, or of enjoining them from proceeding at law to recover the lots and land in question, it must be assumed that neither the answer nor deposition furnish-

ed such ground for assuming that the books were material, as would have authorized such a proceeding; if indeed the chancellor would, under any circumstances, compel a party to produce his own private writings. For, if the answer and deposition showed that Madeira's heirs had in their possession and knowledge clear evidence of the sale and terms of sale of the four lots, surely the chancellor or this court should not have decreed the lots to them; and it does not come with a good grace from them to say either that they had such knowledge, or that their answer was so disingenuous as to have authorized a bill of discovery, calling for further disclosures; we are of opinion, therefore, that it may be assumed, in the present attitude of the case, that Bush not only did not know, but that he was not bound to know of the evidence contained in the letter-books, and now brought forward. On the same ground it may be assumed that Hopkins, if actually ignorant, was not bound to pursue the enquiry into the contents of the books. If he did know, and failed to make use of his knowledge for the benefit of his vendees, that should not preclude Bush from the benefit of his own subsequent discovery; and as Hopkins is dead, and the extent of his knowledge cannot be known, it should not be required that Bush should allege and swear that Hopkins did not know of this evidence. He certainly did, know, at one time, that there was a separate contract for the four lots, and if there was a separate bond he knew that also. If he concealed these facts from the vendees of these lots, his knowledge ought not to preclude them from their remedy.

Then, we cannot doubt that the party or parties interested in the four lots may have a review and reversal of the decree, so far as relates to those lots, upon grounds which do not affect the decree for the rest of the land; and as all the parties interested in these four lots are made parties to the petition or bill of review, and as, even if there be a defect of parties, the bill should not be dismissed absolutely on demur-

sue in a suit, even after it has been decided by the court of appeals, if from the facts alleged it was not to be expected that the party could have found such evidence unless by extreme vigilance.

rer. And as we are of opinion that the petition does make out substantial grounds for a review, therefore, the decree is reversed, and the cause remanded, with directions to overrule the demurrer, and for further proceedings in conformity with this opinion.

MOREHEAD & BROWN for appellant; LINDSEY & HARRIS for appellees.